UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

————

VINCENT T. NEELY,

                Petitioner,                Case No. 1:08-cv-376

v.                                            Honorable Janet T. Neff

KEN McKEE,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Following a jury trial in the Calhoun County Circuit Court, Petitioner was convicted of two counts of first-degree criminal sexual conduct (CSC I), MICH. COMP. LAWS § 750.520b, one count of kidnaping, MICH. COMP. LAWS § 750.439, one count of being a felon in possession of a firearm, MICH. COMP. LAWS § 750.224f, and four counts of possession a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b. On April 11, 2005, he was sentenced, as a fourth felony offender, MICH. COMP. LAWS § 769.12, to life imprisonment on the CSC I convictions, 75 to 115 years on the kidnaping conviction, 15 to 40 years on the felon-in-possession conviction, and four terms of 2 years on the felony-firearm convictions. In his amended *pro se* petition, Petitioner raises seven grounds for relief, as follows:

        I.      [PETITIONER]'S CONVICTIONS SHOULD BE REVERSED BECAUSE HE WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHERE COUNSEL FAILED TO CHALLENGE [PETITIONER]'S WARRANTLESS ARREST IN HIS RESIDENCE.

II.     [PETITIONER]'S CONVICTIONS SHOULD BE REVERSED WHERE THE TRIAL COURT ERRED IN DETERMINING THE PROSECUTION COULD QUESTION [PETITIONER] AND COMMENT ON THE INVOCATION OF HIS RIGHT TO REMAIN SILENT.

III.    [PETITIONER] IS ENTITLED TO A NEW TRIAL WHERE THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING A REQUEST FOR SUBSTITUTE COUNSEL.

IV.     [PETITIONER] WAS DENIED EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL WHERE HIS APPELLATE COUNSEL FAILED TO RAISE A SIGNIFICANT INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL ISSUE ON DIRECT APPEAL OR MOVE FOR AN EVIDENTIARY HEARING AT THE TRIAL COURT LEVEL FOR THE PURPOSE OF EXPANDING THE RECORD AS TO TRIAL COUNSEL['S] INEFFECTIVENESS.

V.      DEFENSE COUNSEL'S FAILURE TO INVESTIGATE AND CALL POTENTIAL WITNESS[ES] KNOWN TO HIM AND TO OBJECT TO IMPROPER COMMENTS THAT WERE PREJUDICIAL VIOLATES A DEFENDANT'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.

VI.     THE PROSECUTOR DENIED [PETITIONER] A FAIR TRIAL AND COMMITTED REVERSIBLE ERROR MISCONDUCT BY REPEATED REFERENCES ABOUT PAST BAD ACTS 404(B) VIOLATING THE DUE PROCESS CLAUSE OF THE STATE AND FEDERAL CONSTITUTIONS BY MAKING NUMEROUS IMPROPER AND PREJUDICIAL COMMENTS TO [THE] JURY'S SYMPATHY AND CIVIL DUTY.

VII.    THE PROSECUTOR DENIED [PETITIONER] A FAIR TRIAL AND COMMITTED REVERSIBLE MISCONDUCT BY REPEATEDLY REFERRING TO [PETITIONER]'S SILENCE VIOLATING THE DUE PROCESS CLAUSE MAKING NUMEROUS IMPROPER AND PREJUDICIAL COMMENTS THAT SUGGEST[ED] TO THE JURY OR [IMPLIED] HIS SILENCE AS GUILT.

(App. D to Am. Pet., docket #24, Page ID##276-80.)

Respondent has filed an answer to the amended petition (docket #30), stating that the grounds should be denied because they are procedurally defaulted or without merit.  Upon review

and applying the AEDPA standards, I find that grounds one, two, three and five are without merit, and ground four is procedurally barred. Accordingly, I recommend that the petition be denied.

## Procedural History

### A.    Trial Court Proceedings

The state prosecution arose from an incident that occurred in the early morning hours of June 17, 2004. A 17-year-old woman was involuntarily transported in a vehicle by Petitioner and co-defendant Cecelia Frederick, after which she was hit and kicked, threatened with a gun, coerced to perform oral sex on Frederick, and twice vaginally penetrated by Petitioner. Petitioner was charged with one count of kidnaping, two counts of CSC I, one count of being a felon in possession of a firearm, four counts of felony-firearm, and one count of larceny from a person. Following a preliminary examination on June 29, 2004, Petitioner was bound over on all charges except the charge of larceny from a person. Petitioner subsequently was charged as a habitual offender, fourth offense. Petitioner was tried before a jury beginning February 15, 2005, and concluding on February 24, 2005.[1]

Beth Ann Castle testified that she was kidnaped and sexually assaulted in the early morning hours of June 17, 2004. Castle did not live in Calhoun County, but she was staying with

_____

[1]The trial consumed seven days and is reflected in ten separate volumes of transcript, designated hereafter as follows:

Tuesday, February 15, 2006, Vol. I: "Tr I at ___."
Tuesday, February 15, 2006, Vol. II: "Tr. II at ___."
Wednesday, February 16, 2006, Vol. I: "Tr. III at ___."
Wednesday, February 16, 2006, Vol. II: "Tr. IV at ___."
Thursday, February 17, 2006: "Tr. V at ___."
Friday, February 18, 2006: "Tr. VI at ___."
Tuesday, February 22, 2006, Vol. I: "Tr. VII at ___."
Tuesday, February 22, 2006, Vol. II: "Tr. VIII at ___."
Wednesday, February 23, 2006: "Tr. IX at ___."
Thursday, February 24, 2006: "Tr. X at ___."

- 3 -

her sister-in-law.  (*Id.* at 20.)  Around midnight or 1:00 a.m., she left the house to meet a friend, Tamika.  She planned to meet Tamika at Horrocks Market, which was an unknown distance away. After she had walked about two blocks, she saw an older, long, blue, four-door car.  (*Id.* at 21-22.) The vehicle was driven by an African-American man about 30 years of age, whom she identified as Petitioner.  A young African-American woman was riding with him.  (*Id.* at 23, 27.)  Castle identified the car from a picture marked as PX 24, and she identified the location at which the pictured car was parked.  (*Id.* at 24-25.)  Castle testified that both of the people in the car asked her if she wanted a ride, but she declined.  (*Id.* at 27-28.)  Castle began to walk again, but the car turned around and came back.  They asked again if she needed a ride, and she again declined.  (*Id.* at 28-29.) The woman began to talk to Castle, but Castle was not paying attention because she was talking on her phone.  (*Id.* at 29.)  Petitioner and the woman then got out of the car, grabbed her by the arms, and put her in the back seat of the car.  (*Id.* at 29-30.)  Castle stated that she did not want to get into the car.  She explained her somewhat different testimony at the preliminary examination, during which she stated she got into the car willingly, saying that, even though she did not originally want to get in, once they had her by the arms, she concluded that she had no choice and did not struggle. (*Id.* at 31-32.)

The woman got into the back seat with her, and they drove around for awhile.  Castle did not use her cell phone, because she was afraid of what would happen to her – that it would be the last day of her life.  (*Id.* at 32-33.)  Petitioner asked to use her cell phone, and she gave it to him. Eventually, he stopped the car at a wooded area, and the woman asked Castle to get out of the car. Castle did not get out, and she asked Petitioner to give her back her phone.  (*Id.* at 33-34.) Petitioner refused to give her the phone at that time, but told her to go with the woman, after which he would

give her the phone. (*Id.* at 34.) Castle again refused to get out. Petitioner then hit Castle in the nose, causing it to bleed. (*Id.* at 35.) Castle identified the hoodie she was wearing at the time, which had blood on the front and on the sleeves. (*Id.* at 36-37.) After Petitioner hit Castle, the woman got Castle out of the car and started to hit her, striking her face and head. (*Id.* at 37.) Petitioner then got out of the car. Castle tried to fight the woman, but she was brought to the ground. Both Petitioner and the woman began to kick her in the stomach and ribs, and they also hit her additional times. (*Id.* at 38.) After awhile, they put Castle back in the car. This time, the woman drove, and Petitioner got into the back seat with Castle. They went a short way and then stopped a block away from a store. (*Id.* at 38-40.) Petitioner got out of the car and went to the store to buy beer. Before he walked away, he came to the driver's window and told the woman to hold onto his gun. (*Id.* at 39-40, 42.) Castle did not see the gun at that time, but she was very frightened. (*Id.* at 40-41.) While Petitioner was gone, Castle talked to the woman. She asked the woman not to kill her because she had a son. Castle testified that she did not have a son, but she wanted them to believe it so they would not kill her. (*Id.* at 42.) At some point in time, Petitioner told Castle that she should not tell anyone what happened, or they would find her. She believed that they would kill her. (*Id.* at 60-61.)

When Petitioner returned with the beer, the woman continued to drive, eventually stopping at brick apartments. She parked the car, and everyone got out. The woman told Castle that they were going up to the apartments, and they did so. The woman unlocked the door. (*Id.* at 42-44.) Castle identified the photograph of the living room at 75 South Burge, Apartment No. 10. Castle stated that she sat on the couch, while Petitioner and the woman went into the bedroom. The woman then called her into the bedroom. (*Id.* at 45-46.) Castle went into the bedroom and sat in a chair. Petitioner and the woman were sitting on the bed. (*Id.* at 46-47.) Petitioner told Castle,

"You can come sit on the bed; you don't have to be scared." (*Id.* at 48.) She did as he asked, because she was afraid to disobey. Petitioner then asked her to take her clothes off, and she complied when Petitioner pulled out a black handgun and pointed it at her. (*Id.* at 48-49, 51.) The woman had gone into the bathroom, and she returned naked. (*Id.* at 50.) Petitioner told Castle to have oral sex with the woman, who was lying on the bed. (*Id.* at 50, 52.) Castle lay down on the bed and did what he asked. (*Id.* at 51.) Petitioner remained sitting on the bed for some time. (*Id.* at 53.) Castle stopped when Petitioner told her to, and then went to sit in the chair. After sitting briefly on the bed with Petitioner, the woman went back into the bathroom. (*Id.* at 55-56.) Petitioner then told Castle to come to the bed with him. Petitioner then had penile vaginal intercourse with Castle. (*Id.* at 56.) Castle denied that Petitioner had intercourse with her while she was engaged in oral sex with the woman, contrary to her preliminary examination testimony, which she did not remember giving. (*Id.* at 53-54, 59.) Castle acknowledged that she was nervous and had difficulty with her memory. (*Id.* at 60.) The following day, as she continued with her trial testimony, Castle stated that Petitioner had penile vaginal intercourse with her when she was having oral sex with the woman. Castle testified that she had been afraid to give that answer the day before. (Tr. V at 51-52.) Because she could not see Petitioner during that first intercourse, she did not know whether Petitioner wore a condom. (*Id.* at 53-54.) She also did not know whether Petitioner ejaculated. (*Id.* at 54.)

Once Petitioner had finished and she was allowed to stop having oral sex with the woman, Castle sat down in the bedroom chair. Petitioner and the woman then engaged in sex. Castle glanced at them, then she looked away. (*Id.* at 55.) After they had finished, the woman went into the bathroom to dress and wash up. Petitioner asked her to go back on the bed. He pushed her down and had sex with her. (*Id.* at 56.) During this second incident, Petitioner used a condom. She

was not sure whether he ejaculated. (*Id.* at 57.) Petitioner then told Castle to go to the bathroom to wash. When the woman came out of the bathroom, dressed, Castle went in, but she did not wash up. (*Id.* at 57-58.) When she came back into the bedroom, Petitioner went to the living room, though the woman stayed in the bedroom. Castle spoke with the woman, repeating that she had to go home to her son. The woman apologized for what she had done, and then she went to the living room and retrieved Castle's cell phone. (*Id.* at 59-60.) The woman then let Castle go. (*Id.* at 60.)

Castle walked the few blocks back to her sister-in-law's house. (*Id.* at 61.) She did not call anyone because her cell phone was dead. When she arrived home, she went inside and changed her clothes. (*Id.*) Castle told her brother and sister-in-law what had happened, and they took her to the police station to make a report. She described the apartment outside and inside. (*Id.* at 64-65.) She also indicated that the apartment had shoes lined up by the door. (*Id.* at 66.) After talking with an officer, she was driven to the apartments, to help find the location. (*Id.* at 63.)

Castle later talked to Battle Creek Detective Wise and told him what had happened. While she was talking to Wise, she was scared, nervous, and could not think. Her face and ribs hurt. (*Id.* at 67.) After talking to Wise, she went to Fieldstone Hospital, but they could not see her until she was examined in the emergency room. (*Id.* at 68.) Pictures were taken of her injuries, but she could not remember whether they were taken at Fieldstone or the emergency room. (*Id.*) She had internal bruising and bruises on her knees. (*Id.* at 68-69.) She also had a black eye and a swollen nose. (*Id.* at 71.) Her injuries lasted for about two weeks. (*Id.* at 68-71.)

Castle then went to Fieldstone, where she was examined by a nurse. (*Id.* at 71-72.) She told the nurse some things about what had happened, but she did not want to talk about it again. (*Id.* at 72.) She gave the clothes she had been wearing to the police. (*Id.*) The nurse collected hair

from her head and pubic area, and then did a vaginal examination. (*Id.* at 73-74.) She did not arrive home until about 4:00 p.m. She continues to have nightmares. (*Id.* at 74.) Castle identified the names Donna Williams and Terrance Ward as her best friend and her friend's boyfriend, both of whom are friends of Petitioner. She denied having told either one that she had taken a shower or made the story up. (*Id.* at 78-79.) She reiterated that she continues to be afraid of what will happen after she testifies, and stated that her fear was the reason she had testified differently the day before. (*Id.* at 78-79.) She reported hearing that Petitioner's mother would do something to her. (*Id.* at 80.) Castle testified that she was supposed to take a thyroid medication, but she was not taking it at the time of the assault or at the time of trial because she did not like taking it. When she was off her medication, her memory was poor. (*Id.* at 139-41.)

At 5:30 a.m. on June 17, 2004, Battle Creek Police Police Officer Julie Hubbard was dispatched to the Emmett Department of Public Safety in reference to a possible CSC reported by Beth Castle. Hubbard met Castle, whose nose was swollen and who had dried blood near her nostril. (Tr. III at 13-14.) Castle initially appeared unemotional, and Hubbard had some questions about Castle's mental capabilities. (*Id.* at 16, 18.) Hubbard and Castle drove to the Georgetown Apartments, and Castle had difficulty finding the right building. (*Id.* at 17-18.) After about 30 minutes, using certain reference points, including the location of the pool, the presence of a wreath on the door, and the placement of a fan in the window, they identified the address as 75 South Burge, Apartment No. 10. (*Id.* at 20-21.) Castle told Hubbard that the events occurred at about 1:30 a.m. She also indicated that a black Lincoln Towncar had been used, and she identified the perpetrators as a 20-year-old 6' 1" black male with a slight goatee and mustache and acne scars, as well a 5' 9" black female whose hair was in a ponytail. (*Id.* at 21-24.) In addition, Castle described the man as

wearing a black, hooded, zip-style sweatshirt, khaki shorts, white tennis shoes, and a gold-tone necklace with a charm. She described the female as initially wearing a black shirt and red pants, which she had later changed into a black jogging outfit. (*Id.* at 24-25.) After Castle was advised that the two suspects were in custody, she began to cry. (*Id.* at 30.)

Battle Creek Police Sergeant Arthur McClenney testified that he came to work early, before his shift began at 6:00 a.m. on June 17, 2004, and proceeded to the Georgetown Apartments. (*Id.* at 32-33.) He spoke with Officer Hubbard and then went to the identified apartment with other officers. (*Id.* at 34.) They knocked at the door, but they received no response. McClenney was concerned for the safety of the residents, knowing that some type of handgun had been reported. He contacted the office about a search warrant, but after considering his concerns, he had an officer contact the apartment-complex maintenance department. (*Id.* at 36-37.) A maintenance person arrived and unlocked the door. Officers then loudly announced their presence before entering the apartment. When they came in, they found a woman wearing a black sweat suit with "New York" written on the front, who was sitting on the couch. (*Id.* at 38-39.) The officers asked if anyone else was in the apartment, but the woman refused to answer. McClenney sent Officers Sparschu and Roth into the apartment to check further. They found Petitioner under the bed. (*Id.* at 39-41.) Petitioner was placed under arrest, and the woman was taken into custody for questioning. (*Id.* at 41-42.)

Battle Creek Police Officer Curt Roth testified substantially consistently with Sergeant McClenney. (*Id.* at 54-69.) Roth repeated McClenney's assertion that the officers feared for the safety of the residents, knowing that a gun was involved. (*Id.* at 68.) He searched the apartment with Officers Sparschu and Weiss. Roth lifted the bed, exposing a tall, black man, who

was underneath it.  Officer Sparschu pointed his gun at the man while Officer Weiss handcuffed him.  (*Id.* at 63-65.)  Roth only got a brief look at the man's face, so he could not identify Petitioner.  (*Id.* at 67.)

Officer Brian Sparschu also substantially corroborated McClenney's testimony.  (*Id.* at 77-89.)  Like Officer Roth, Sparschu did not get a good look at the man's face.  (*Id.* at 87.)  Officer Weiss also corroborated the story.  (*Id.* at 96- 104.)  After entering the apartment, Weiss asked to see the female's hands, to ensure officer safety.  (*Id.* at 98.)  He then went to the bedroom, where he handcuffed and patted down the man who was hiding under the bed.  (*Id.* at 99.)  He waited at the apartment until a search warrant was obtained, and then he stood by while other officers searched the apartment.  (*Id.* at 101.)  Subsequently, along with Tara Wesseldyk, he reviewed a surveillance tape from the Liberty Mart across the street.  They were unable to determine anything from the tape.  (*Id.* at 101-02.)

Battle Creek Police evidence specialist Tara Wesseldyk confirmed that she viewed the surveillance tape.  (Tr. VI at 52-53.)  She also collected Castle's phone and clothes, and she also collected clothing from Petitioner and Cecelia Frederick.  (*Id.* at 28-29.)  Wesseldyk took photographs during the search of the apartment, as well as photographs of the automobile near the apartment, which showed Natural Lite beer bottles.  (*Id.* at 31-32, 38-42.)  She then went to Fieldstone and took photographs of Beth Castle's mouth and bruised knee.  (*Id.* at 38-40.)  She subsequently took photographs of Beth Castle as the bruising developed in the following days.  (*Id.* at 43-44.)

Sergeant Martin Brown was the Crime Lab Supervisor for the Battle Creek Police Department.  (Tr. V at 5.)  Brown testified that the initial entry into the computerized evidence

system was inadvertently dated April 17, 2004 (04/17/2004), rather than June 17, 2004 (06/17/2004). That error on the first screen was carried over onto the other evidence entries for the case, but its sole purpose was to trigger a report to an evidence technician in ten years to consider disposal of the evidence. The evidence items themselves were dated with the correct date. (*Id.* at 7-8.) He testified that he participated in the search of the apartment. He collected Petitioner's identification card, a blue hooded sweatshirt, three pairs of khaki-colored shorts, a condom in a package, two used condoms, two condom wrappers, a condom box, a used paper towel, three used washcloths, and an empty liquor bottle. (*Id.* at 5-7, 9-14, 18.) He also identified photographs of the items before they were placed in the evidence envelopes. (*Id.* at 15-17.) Brown identified DNA samples taken from Petitioner, Frederick and Castle, as well as swabs from Frederick's and Petitioner's fingernails and the grip of the handgun. (*Id.* at 18, 20, 27.) Brown also testified to the items taken from the 1987 Lincoln Towncar, which included numerous beer bottles, a black trash bag, and two brown paper bags. The beer bottles were tested by lab specialist Joel Shepperly, who confirmed Petitioner's fingerprints on one of the beer bottles found in the back seat. (*Id.* at 37; Tr. VI at 81.)

Battle Creek Police Detective Brad Wise was called to the station on June 17, 2004, on a report that two people were there for him to interview: Petitioner and Cecelia Frederick. (Tr. III at 107-08.) Wise interviewed Petitioner first, followed by Frederick. Wise read Frederick her *Miranda* rights. (*Id.* at 110.) Wise attempted to read Petitioner's *Miranda* rights to him, but he would not pay attention. (*Id.* at 110, 151-52.) Both interviews or attempted interviews were taped. (*Id.* at 110.) After interviewing Frederick, Wise took the search warrant he had obtained to the apartment, and the apartment was searched by Wise, Sergeant Brown, Crime Scene Tech Wesseldyk, and Detective Brann. (*Id.* at 112, 130.) The bedding was collected for evidentiary purposes. In

addition, in one of the dresser drawers, the officers found a loaded, .38 caliber, six-shot revolver, tucked inside a blue stocking cap. (*Id.* at 115-16, 119, 121.) On the top of the dresser was an unused condom in the package. (*Id.* at 124.) Two used condoms and wrappers were in the waste basket. (*Id.* at 125.) Petitioner and his mother, Maddie Morgan, lived in the apartment. (Tr. IV at 7, 17.)

After the search, Wise went to Fieldstone Hospital, where the victim was being examined by the sexual assault nurse examiners. (Tr. III at 136.) When Wise talked to Castle, he noticed that her nose was swollen, there was a small cut on the bridge of her nose, and the right side of her face and underneath her eye were discolored and beginning to swell. He later noticed that Castle had marks on the right side of her neck. (*Id.* at 137, 139.) Castle also complained of pain in her side and her leg. (*Id.* at 137.) Crime Scene Technician Wesseldyk also came to Fieldstone, in order to collect any evidence and to take photographs of Castle. (*Id.* at 138.) He saw Wesseldyk photograph an injury to Castle's mouth, obtained when Castle pulled her lip away. (*Id.* at 138, 141.) In a free narrative, Castle told Wise what had happened. (*Id.* at 142-43.) Wise testified that Castle was upset, embarassed and teary-eyed when she began her story. She later began to cry, holding her arms across her body, like she was hugging herself. (*Id.* at 143-44.) Castle described one perpetrator as a black male wearing a white tank t-shirt, dark-colored hoodie-style sweatshirt, khaki shorts, and white tennis shoes. She also described the man wearing a gold necklace with a charm on it. (*Id.* at 144-45.) Castle described the other person as a black female wearing red pants and a black shirt, which she later changed to a dark-colored sweat suit with "New York" written on the front. (*Id.* at 145-46.)

Wise testified that he interviewed Cecelia Frederick twice, once at the station at about 8:00 a.m. on June 17, 2004, and a second time at the Calhoun County Jail, at about 3:00 p.m. that same day. Both conversations were recorded. (Tr. IV at 4-5.)

During Detective Wise's testimony, the court excused the jury to consider the admissibility of certain videotaped evidence of Petitioner's conduct during his post-arrest questioning. (Tr. III at 148-49.) After playing the videotape for the court, the prosecutor sought to introduce the evidence for several reasons: (1) to demonstrate that Petitioner was wearing the same or similar t-shirt to that described by the victim; (2) as rebuttal to defense counsel's questions suggesting that Petitioner had been cooperative at the time of his arrest; (3) the videotape demonstrated that Petitioner had not invoked his right to remain silent or asked for an attorney; and (4) defense counsel had opened the door to the information by arguing that the sexual conduct had been consensual. The court reserved ruling on the admissibility of the statement until evidence of the defense had been introduced. (*Id.* at 153.)

Tanya Waschak was qualified as an expert in the area of sexual assault nurse examinations. (Tr. V at 148-50.) She examined Castle at about 8:30 a.m. on June 17, 2004. (*Id.* at 152.) Castle was initially very quiet. (*Id.*) In response to questioning, Castle told Waschak that she had been sexually assaulted after being taken in a vehicle and driven around first. (*Id.* at 154.) Castle reported more than one assault by the man and oral sex with the woman. (*Id.* at 155.) Waschak testified that Castle had reported vulvar penetration by the man's penis, but she did not know whether the man had ejaculated. (*Id.* at 156-57.) After the assault Castle reported that she had urinated and wiped, smoked, had something to drink, and changed her clothing. (*Id.* at 157.) Castle had head and facial pain and reported having been hit a number of times in the head and face.

Waschak sent Castle to the emergency room before examining her. When Castle returned, Waschak began her physical examination. Castle had numerous abrasions, bruising and areas of tenderness. (*Id.* at 158.) Castle had a large, raised hematoma on the side of her head, significant pain across the front of her face and cheekbones, and she reported having been backhanded by a man. On the right side of her neck, she had a red line that looked like a scratch, and she reported that the woman had scratched her. She did not appear to have injuries on her front, but she had very tender areas across her back, from the upper part of her shoulders through her lower back. (*Id.* at 159-60.) She also had several scrapes on her left arm, reportedly caused by having been shoved down on the pavement. On her left hand, she had a scratch or abrasion near the palm of her left hand. On the inner aspect of her left knee, Castle had a dark purple bruise. (*Id.* at 161-62.)

After the external examination, Waschak performed a speculum examination with dye, to determine areas of injury. Castle had vaginal abrasions on the external genital area, consistent with her description of the assaults. (*Id.* at 164-66, Tr. VI at 5, 19.) Waschak found no injuries on the internal examination, but she noticed a thick, yellow discharge. (Tr. V at 166.) Waschak provided Tylenol for the headache, together with emergency contraception and three medications as preventative treatment for sexually transmitted diseases. (*Id.* at 167.) She also collected evidence, including taking a 12 to 15 follicle hair sample from the patient and combing to collect any loose hairs from someone else. In addition, she did vaginal and oral swabs, as well as swabs of external areas Castle reported having been scratched. (*Id.* at 167-69.) She did not collect Castle's clothing, as Castle reported having already changed clothes. (*Id.* at 168.) Waschak also inquired about whether Castle had been drinking or using drugs. Castle denied drinking and told Waschak that she was supposed to take PTU. (Tr. VI at 11.) Castle told Waschak that she had

Graves Disease, a hyperactive thyroid condition. (*Id.* at 17-18.) But she did not tell Waschak that she was not taking her medication. (*Id.* at 11.)

Tara Wesseldyk testified that she was employed at the Battle Creek Police Department Forensic Science Laboratory. (*Id.* at 27.) Wesseldyk collected a variety of clothing and other evidence from Castle, Frederick, and Petitioner and from the search of Petitioner's mother's apartment, including the stocking hat and gun. She also took pictures. (*Id.* at 28-34.) In addition, she took pictures of Petitioner's car and its contents. (*Id.* at 35-40.) She also took pictures of the victim at Fieldstone, and she identified photographs of the victim's injuries. (*Id.* at 40-44.) She also testified, as an expert in latent fingerprinting, that she had not found any latent fingerprints on the victim's phone. (*Id.* at 46-47.)

The parties then stipulated that Petitioner was on parole for a five-year felony at the time of the incident, and he therefore was not allowed to possess a firearm. (*Id.* at 85, 90-91.)

Cecelia Frederick, Petitioner's co-defendant, testified that she was 17 years old on June 17, 2004. (Tr. VII at 5.) Frederick was charged with kidnaping, CSC I, and unarmed robbery. In exchange for testifying against Petitioner, Frederick pleaded guilty to attempted kidnaping and attempted CSC I. (*Id.* at 5-6.) On the night of the incident, she had known Petitioner for about three weeks. He was significantly older than she, and she had strong feelings for him. (*Id.* at 8-10.) She got into Petitioner's dark-colored Lincoln at about 10:00 or 11:00 p.m. on June 16, 2004. (*Id.* at 13, 17-18.) A black girl was already in the car, and they dropped her off on the north side of Battle Creek. (*Id.* at 19.) They continued to drive on the east side of town, when they saw a white female on Cliff Street, in the Post Edition[2]. (*Id.* at 20.) Petitioner asked the woman if she wanted a ride,

---

[2]"Post Edition" apparently refers to the Post/Franklin neighborhood in Battle Creek.

and the woman said no. (*Id.* at 21.) Petitioner told Frederick to ask her if she wanted a ride. The woman was on the phone, so she initially did not respond. Frederick asked where she was going, and the woman eventually got into the back seat of the vehicle. (*Id.* at 22.) They drove to Horrock's, because that is where the woman said she wanted to go. (*Id.* at 23.) Petitioner, however, did not drop the woman off at Horrock's. Instead, he went up by the Washington Bridge and then kept going to the north end of town. (*Id.* at 23-24.) The woman, whom she now knows was Beth Castle, asked why she had not been dropped off. Petitioner said that he was going to get some weed. (*Id.* at 24-25.) They stopped in an alley where there were a lot of trees. (*Id.*) Petitioner told Frederick to fight Castle. (*Id.* at 25-26.) Frederick hesitated for a minute, but she then did as he asked. (*Id.* at 26.) Frederick testified that she was afraid what Petitioner would do if she refused. (*Id.*) Frederick pulled Castle out and away from the car, and then she began hitting Castle on her arms and then her face. (*Id.* at 27-28.) Petitioner got out of the driver's seat and then jumped into the fight, throwing closed-fist punches and kicking Castle. (*Id.* at 28-29.) Castle tried to fight back, but she fell onto the pavement, crying. (*Id.* at 29.) Frederick eventually stood up and walked to the car. (*Id.* at 31.) Petitioner ordered Castle to get back into the car. Castle got into the back, and Petitioner also got into the back. Frederick sat in the driver's seat. (*Id.* at 31-32.)

With Frederick driving, they went to the Liberty Mart so that Petitioner could buy some beer. (*Id.* at 15-16, 32.) They did not park in the lot, but, at Petitioner's insistence, parked behind the Liberty Mart. (*Id.* at 33.) When Petitioner got out, Castle moved to the front seat. Petitioner came to the front of the car, holding a hand gun. He hit the steering wheel with the gun, and he told Castle that Frederick was holding his gun. Although it was dark, Frederick could see the gun. She knew that he had it all evening, but when he struck the steering wheel with it, she was

afraid that Petitioner would use it. (*Id.* at 34.) Petitioner did not actually leave the gun with her. (*Id.* at 35.) Frederick understood that Petitioner wanted Beth Castle to stay in the car, and, because she was afraid of what Petitioner would do, Frederick did not let Castle know that she did not have the gun. (*Id.* at 36.) Frederick testified that she and Beth Castle did not talk during the five minutes Petitioner was gone. (*Id.* at 37.)

Petitioner returned with a bag, which she later learned contained beer. (*Id.* at 38.) They drove around the Post Edition for about 30 to 40 minutes, drinking beer. (*Id.* at 38-39.) They eventually headed to the Georgetown Apartments, where Frederick knew Petitioner's mother lived. (*Id.* at 40.) She parked the car and they all walked up to apartment No. 10, Petitioner's mother's apartment. Castle followed Frederick and Petitioner. (*Id.* at 41.) Frederick testified that the apartment had a wreath on the door. All three of them went into the bedroom. (*Id.* at 42.) Frederick sat on the front of the bed, Petitioner sat farther back on the bed, and Castle sat in the chair. (*Id.* at 43.) Petitioner then told Frederick and Castle to take their clothes off. Frederick complied, but Castle just sat for a few minutes. (*Id.* at 44-45.) Castle finally took her clothes off. Petitioner then told Castle to perform oral sex on Frederick. (*Id.* at 46.) Frederick did not want that, but she let it happen because Petitioner told her to, and she knew that Petitioner still had the gun. (*Id.* at 46-47.) Petitioner had Frederick's legs on Castle's shoulders, and Frederick could see Petitioner go behind Castle and start to move back and forth. (*Id.* at 47-48.) Frederick thought that he was having sex with Castle. (*Id.* at 49.) After Petitioner was done, he told Frederick to go to the bathroom to wash up. (*Id.* at 50.) She remained in the bathroom for about 15 minutes. (*Id.*) The door was closed, and Frederick did not know what happened while she was in there. When she finally came out of the bathroom, Castle was dressed and sitting in the chair, and Petitioner was dressed and heading into

the living room. (*Id.* at 50-51.) Frederick spoke with Castle about Petitioner and about Castle's baby. (*Id.* at 51.) Castle told Frederick that she needed to go home to her son. Frederick already felt that what had happened was wrong, but after talking to Castle about her son, Frederick decided to let Castle go. (*Id.* at 52.) Once Petitioner fell asleep on the couch, Frederick took Castle's cell phone out of his pocket, gave it to Castle, and sneaked her out of the apartment. (*Id.* at 53-54.) Frederick walked Castle out of the apartment and told her what direction to go to get back to where she wanted to be. (*Id.* at 54.)

Frederick acknowledged on both direct and cross examination that the story she originally gave the police was very different. In her initial statement, Frederick told Detective Wise that there were four people in the vehicle and that Castle was paired with a friend of Petitioner's, in an arrangement like a double-date. Frederick also told Wise that she never saw a gun. (*Id.* at 8, 11, 13-15, 58-59.)

Cornelia Lewis testified that she had been serving time in the Calhoun County Jail, living in the same jail pod with Cecelia Frederick. (*Id.* at 100-01.) Petitioner also was housed at the jail at that time. (*Id.* at 107.) On February 2, 2005, she talked to Petitioner while they both were in the jail visiting room to meet their visitors. (*Id.* at 101, 106-07.) Lewis had known Petitioner for a couple of years before talking with him at the jail. (*Id.* at 104.) Petitioner told Lewis that he needed her "to beat that bitch's ass for me." (*Id.* at 102.) Although Petitioner did not ever say Frederick's name, Lewis understood who he meant, because he indicated that "she was trying to get him sent to prison for the rest of his life for some bullshit." (*Id.* at 103.) Lewis testified that she told Petitioner that he would need to pay her. Petitioner told Lewis that he would have someone put some money in her account. (*Id.* at 102.) Lewis stated that she did not assault Frederick, but instead

- 18 -

told her about Petitioner's statement "the next day," which she later indicated was Thursday, February 8, 2005.  (*Id.* at 102-03, 106.) Lewis did not report the conversation to a correctional officer, but, when the pod deputy asked her about it later on the Thursday after she told Frederick, Lewis provided the information.  On Friday, the prosecutor's office contacted her.  (*Id.* at 106.)

Ann Elizabeth Gordon testified as a forensic scientist for the Michigan State Police Lansing Laboratory Biology Unit.  (*Id.* at 109.)  She compared known DNA samples from Castle, Frederick and Petitioner, to DNA found on samples taken from the criminal sexual conduct kit, including vaginal, rectal, and oral swabs and a swab from the victim's neck, as well as two used condoms.  (*Id.* at 112-13, 116.)  She did not find any foreign DNA on the vaginal swab taken from Castle.  (*Id.* at 120.)  In the swab taken from Castle's neck, Gordon could not exclude Petitioner or Frederick as having contributed.  (*Id.* at 121-22.)  One of the used condoms possibly showed Petitioner's DNA with an unknown female.  (Tr. VIII at 7-8.)  The other used condom showed Petitioner's DNA possibly mixed with that of Castle and/or Frederick on the inside of the condom.  (*Id.* at 10-11.)  The outer surface of the condom showed Castle as the primary contributor and possibly both Frederick and Petitioner as secondary contributors.  (*Id.* at 12.)  The gun handle also had mixed DNA, with likely contributions by Frederick and Petitioner.  (*Id.* at 16.)

In addition to a series of character witnesses, Petitioner testified in his own defense. (Tr. IX at 4-116.)  According to Petitioner, he had been with Mrs. Shepherd, the "other donor" identified by the DNA analyst.  (*Id.* at 5.)  He received a phone call from Frederick at about 10:30 p.m., and Shepherd drove to pick up Frederick on High Street.  They dropped off Shepherd on the north side at about 10:30 or 11:00 p.m, after which Frederick drove for awhile before heading to the Georgetown Apartments, where they remained until about midnight.  (*Id.* at 5-6.)  Petitioner called

Patricia McClinton, and then they left the apartment, so that Petitioner could pick up some beer. As they were driving at about 12:30 a.m., they saw Castle walking down the street and talking on her phone. Petitioner assumed that Castle was a prostitute. (*Id.* at 6-7.) Petitioner attempted to talk to Castle, but he was forced to pull into a driveway to get out of the traffic. Castle walked over to the car. Frederick then talked to Castle, and Castle got into the back seat. (*Id.* at 7-8.) Petitioner told Castle that he and Frederick wanted to have some fun, and they asked if she smoked weed and drank. Castle said she did, and Petitioner asked if she wanted to go with them to get weed and something to drink. Castle said she did not want to. Frederick then asked her if she had ever been with a female and whether she would engage in a threesome. (*Id.* at 8.) After they had driven away, Petitioner asked to borrow Castle's phone, so that he could call to see if he could get some weed. (*Id.* at 9.) While he was dialing the phone, it rang. He gave Castle the phone and then overheard a man arguing with Castle. (*Id.* at 9-10.) When Castle's call was over, he asked to borrow the phone again. As soon as she handed it to him, it rang again. Petitioner handed the phone back, and Castle spoke with a woman. While she was on the phone, Frederick told Petitioner that she knew where she could get some marijuana. (*Id.* at 11.) He drove to where Frederick directed him. (*Id.*) Petitioner went to Artmore or Arlington Street and gave Frederick the money to buy the weed. He got out of the car and called his own house, attempting to pick up a message from his answering machine. The next thing he knew, Frederick had pulled the back door open, snatched Castle out of the back seat, and started beating her in the face, throwing her to the ground, and kicking her. (*Id.* at 12.) He watched for a minute and then went over to break it up, kicking Castle and hitting Frederick until it ended. He then told Frederick to drive, and Castle sat in the front passenger seat. (*Id.* at 13-14, 17.) They drove to Wabash Street, where his friend had told him to go to get some

marijuana, stopping at a house just behind the Sir Pizza. At that point, he saw the police in the Chicken Coop parking lot, so he told Frederick to drive around the corner. (*Id.* at 14-15.) He got out of the car and proceeded to the house to get some weed. (*Id.* at 15.) Petitioner denied having a gun or showing a gun to Frederick. (*Id.* at 15.) Petitioner bought some marijuana and then bought some beer at the Liberty, which was right nearby. He was gone about 15 minutes. Petitioner testified that, when he left, the car was running, and Castle and Frederick could have driven away. (*Id.* at 16.) After Petitioner returned to the car, they rode around some more, and then Frederick wanted to go back to the Georgetown Apartments. Petitioner testified that no one drank or smoked in the car and that the beer cans and bottles were from the prior Sunday night, when he was out with friends. (*Id.* at 18-19.) The three went to the apartment, which belonged to Petitioner's mother, who was in jail on a complaint of assault with intent to murder Petitioner. (*Id.* at 61-62.)

After they parked the car, Petitioner collected his CDs and other things. Frederick led the way to the apartment, followed by Castle. Petitioner was behind both women, and, rather than following them straight up the stairs, he claimed to take a zigzag route up one set of stairs, across the walk, and up another set of stairs, in accordance with his alleged habit. (*Id.* at 19, 60-61.) Frederick opened the door to the apartment, and Petitioner entered, followed by Frederick and Castle. (*Id.* at 19-20.) Petitioner dumped his things in the bedroom chair and turned on the TV. He sat on the bed. Frederick followed Petitioner to the bedroom, but Castle remained in the living room until Frederick went to get her a few minutes later. (*Id.* at 20-21.) Petitioner gave Frederick and Castle beers. Castle opened hers and drank it, but Frederick took hers to the kitchen and put it in the refrigerator. She then locked the kitchen door. (*Id.* at 21.) Frederick and Castle smoked some marijuana. After about a half an hour, Petitioner suggested they get naked, as they had discussed in

the car.  (*Id.* at 22.)  Petitioner took his shirt off, and Frederick went to the bathroom.  Castle took her shirt off, but then hesitated until Frederick returned.  (*Id.* at 22.)  After Frederick returned, she and Castle undressed and got onto the bed together.  Petitioner denied ordering anyone to do anything, and he denied having a gun.  (*Id.* at 23, 26.)  Petitioner told Castle and Frederick to have oral sex, and Castle performed oral sex on Frederick.  (*Id.*)  Petitioner watched before putting on a condom.  He then had intercourse with Frederick.  (*Id.* at 24.)  After a few minutes, Castle continued having oral sex with Frederick, and Petitioner walked behind Castle and had intercourse with her.  (*Id.* at 25.)  Frederick went into the bathroom.  Petitioner claimed that he had finished having sex with Castle by the time Frederick came out to get her clothes.  Castle put her clothes on.  Petitioner handed Frederick the condom, and Frederick returned to the bathroom to clean up.  When Frederick was finished in the bathroom, Castle went in, so that she could clean up.  Petitioner was lying on the bed, and he fell asleep.  He denied ever going into the living room, and he claimed to have slept through the night.  (*Id.* at 25-26.)  When he fell asleep, Castle's phone was in his sweatshirt, which was on a chair in the bedroom with his clothes.  (*Id.* at 27, 32.)  He woke only when the police knocked on the door.  (*Id.* at 26-27.)  According to Petitioner, the police did not identify themselves at that time.  (*Id.* at 72.)  Petitioner went to the door and looked under it, though he did not look through the peep hole.  (*Id.* at 28, 72-73.)  He heard the sound of walkie-talkies.  (*Id.* at 26, 28.)  He went back to the bedroom and looked out the window, where he saw a police officer walk toward the apartment office and then come back with a maintenance man.  He did not want to open the door, ostensibly because he thought the police were serving him with a subpoena for a court appearance to testify against his mother on the assault charge.  (*Id.* at 28, 61, 76.)  Petitioner therefore hid under the bed.  (*Id.* at 29.)  Petitioner stated that he did not learn why the police had come until he got to

the Battle Creek Police Department.  (*Id.* at 29, 94-95)  Petitioner testified that he would never be

so desperate as to do what he had been charged with doing, as he did not have any problem getting

women to like him, and he had seven children by five different women.  (*Id.* at 30-31.)

Petitioner acknowledged on cross-examination that Castle had told him that she was

not going anywhere until she got her phone back.  (*Id.* at 71.)  Petitioner, however, did not give it

back to her.  (*Id.* at 51-52, 71.)  Petitioner also denied that the gun that was found in the apartment

belonged to him.  (*Id.* at 83.)  The prosecutor challenged Petitioner's credibility by getting him to

admit that, despite being prohibited by his parole from drinking, he drank on the weekends because

he was only tested during the weekdays.  (*Id.* at 59-60.)  In addition, Petitioner admitted that, on the

day of the incident, he had lied to his employer about needing to be off work in order to testify at

court, even though he had no intention of testifying against his mother.  (*Id.* at 78.)  Moreover,

Petitioner acknowledged that, unlike Castle and Frederick, Petitioner had been in the courtroom

during the testimony of all of the other witnesses.  (*Id.* at  32-33.)

When the prosecutor asked who at the police department had told Petitioner why he

was being arrested, Petitioner could not remember, but he indicated that he remembered Detective

Wise as a person who had "come and tried to talk to me."  (*Id.* at 95.)  The prosecutor asked what

Petitioner meant that Wise was trying to talk with him.  Defense counsel objected on the basis of the

earlier *in camera* argument about the use of Petitioner's silence.  The court indicated that the

question being asked was different, and that he would allow Petitioner to answer the question.  (*Id.*

at 97.)  In response, Petitioner stated:

> When he came in the room to say something to me, interrogate me, I feel that's what
> he was trying to do, I didn't say anything because I feel I was exercising a right to the

first thing on the sheet say you have a right to remain silent, and that's what I was exercising, my right to remain silent.

(*Id.* at 97.) The prosecutor asked why, if the sexual incident was consensual, as Petitioner had now testified, Petitioner did not explain that to Defendant Wise when he was interviewed. (*Id.* at 99.) Upon defense counsel's objection, the jury was excused. (*Id.* at 100.) The court ruled that the prosecutor had a right to inquire, but the court would give a cautionary instruction as to how the evidence could be used. (*Id.* at 102-04.) The jury was returned, and the prosecutor asked whether, during his interrogation, Petitioner had told Detective Wise that the sexual incidents were consensual. Petitioner answered that he chose to say nothing. (*Id.* at 106.)

During his closing argument, the prosecutor argued that Petitioner had the opportunity to be present during the testimony of all other witnesses, was the only witness who had that opportunity, was the only witness who had not made a statement to police, and therefore was the only witness who had the ability to tailor his testimony to the evidence. (Tr. IX at 125-26.) The prosecutor also pointed out that, while Petitioner was able to give detailed testimony about what he was wearing, he was evasive and could not provide any detail about the alleged discussion between Castle, Frederick and himself about their plans to have sex together – despite the fact that he admitted driving around together for at least one hour. (*Id.* at 134, 145-46.) Further, the prosecutor pointed out that, despite his extensive testimony on direct and cross-examination, Petitioner had never disputed Cornelia Lewis' testimony that he had offered to pay Lewis if she would beat up Frederick. (*Id.* at 175.)

During its jury instructions, the trial court gave the following special instruction:

The prosecution has introduced – or offered testimony which the prosecution contends shows that the defendant refused the opportunity to provide his account of

- 24 -

these events when interviewed by Officer Wise soon after learning what he was accused of. The defendant claims that he was exercising his right to silence. If you decide that the defendant, by remaining silent, was exercising his constitutional right to remain silent, you must not hold this evidence against him whatsoever or use this evidence for any purpose, whatsoever. If you decide, on the other hand, that the defendant's silence was not an exercise of his constitutional right, only then may you consider his silence. In that event, you may consider it for whatever you think it may prove concerning the credibility of his testimony.

(Tr. X at 22.)

At the conclusion of trial, on February 24, 2005, the jury found Petitioner guilty on all counts. (*Id.* at 34.) On April 11, 2005, he was sentenced, as a fourth felony offender, to life imprisonment on the CSC I convictions, 75 to 115 years on the kidnaping conviction, 15 to 40 years on the felon-in-possession conviction, and four consecutive terms of 2 years on the felony-firearm convictions, all of which were to be served consecutively to the remainder of his term of sentence for the offense for which he was on parole at the time of the new felony conduct. (Sentencing Transcript, (S. Tr.), 15-16, docket #48.)

### B. Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by counsel on November 23, 2005, raised the first three issues listed in this application for habeas corpus relief. (*See* Def.-Appellant's Br. on Appeal, docket #49.) On March 13, 2006, Petitioner filed a pro per supplemental brief on appeal, raising two grounds not presented in the instant habeas application. (*See* Def.-Appellant's Supp. Br. on Appeal, docket #49.) In an unpublished opinion issued December 12, 2006, the Michigan Court of Appeals rejected all five appellate arguments and affirmed Petitioner's convictions and sentences. (12/12/06 Mich. Ct. App. Op. (MCOA Op.), docket #49.)

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme Court. Petitioner raised only the three claims previously raised by counsel in the Michigan Court of Appeals. By order entered May 30, 2007, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (*See* Mich. Ord., docket #50.)

## C.  Post-conviction relief

Petitioner initially filed the instant habeas action on April 23, 2008, raising all seven grounds presented in the amended habeas petition. In a motion filed May 7, 2008 (docket ##5, 6), Petitioner moved for a stay of the proceedings to allow him to exhaust Grounds IV to VII by way of a motion for relief from judgment in the state courts. The Court granted the motion on July 1, 2008 (docket ##10, 11), dismissing the unexhausted claims and staying the remainder of the case pending exhaustion in the state courts.

On May 8, 2008, Petitioner filed a motion for relief from judgment in the Calhoun County Circuit Court, raising the four remaining grounds set forth in his habeas petition. The court denied the motion, finding that Petitioner's trial-level claims could and should have been raised on direct appeal and that his claim of ineffective assistance of appellate counsel could not serve as cause excusing his default. (5/20/08 Cir. Ct. Ord., docket #52.) Petitioner sought leave to appeal all four grounds to the Michigan Court of Appeals, which denied leave to appeal on December 2, 2008. (12/2/08 Mich. Ct. App. Ord, docket #52.) The Michigan Supreme Court denied leave to appeal on August 6, 2009. (8/6/09 Mich. Ord., docket #53.)

On December 16, 2009, the Court reopened the case (docket #17), and Petitioner filed an amended petition and brief in support (docket ##18, 19). The Court then ordered (docket #26)

the Respondent to answer the amended petition and to file the record materials required by Rule 5, RULES GOVERNING § 2254 CASES. Respondent has answered the petition (docket #30), and Petitioner has filed a reply brief (docket #55).

## **Standard of Review**

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme

Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001); *see also Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Id.* at 410.

Where the state appellate court has issued a summary affirmance, it is presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *See Harrington v. Richter*, 131 S. Ct. 770, 784 (2011); *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference). The

presumption, however, is not irrebuttable. *Johnson*, 133 S. Ct. at 1096. Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review. *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Richter*, 131 S. Ct. at 785 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

I.      <u>Ground II:  Admission of Petitioner's Post-Arrest Silence</u>

In his second ground for habeas relief, Petitioner contends that the trial court erred in permitting the prosecutor to question Petitioner about his post-arrest silence and improperly permitted the prosecutor to comment on that silence.  The state court addressed the issue as follows:

> Defendant argues that the trial court erred in allowing the prosecutor to question him about why he did not tell the police that the sexual acts were consensual.  We disagree.  We review a trial court's decision regarding the admissibility of evidence for an abuse of discretion.  *People v Katt*, 468 Mich 272, 278; 662 NW2d 12 (2003).

> The credibility of a witness may be attacked by showing that he failed to speak or act when it would have been natural to do so if the facts were in accordance with his testimony.  *People v Martinez*, 190 Mich App 442, 446; 476 NW2d 641 (1991).  But the constitutional privilege against self-incrimination and the right of due process restrict the use of a defendant's silence in a criminal trial.  *People v Dennis*, 464 Mich 567, 573; 628 NW2d 502 (2001).  "The defendant's right to due process is implicated only where his silence is attributable to either an invocation of his Fifth Amendment right or his reliance on the Miranda[3] warnings."  *Solmonson*, *supra* at 664-665.

> A review of defendant's videotaped interview shows that defendant answered some preliminary questions such as how far he had gone in school, when he last slept and ate, and whether he was on any medication, but then became uncooperative and refused to answer any more questions.  Defendant argues that his act of remaining silent was sufficient to invoke his Fifth Amendment right to remain silent and, therefore, it was improper to use his silence against him at trial.  We disagree.

> A defendant's invocation of his right to silence must be unequivocal.  *People v Adams*, 245 Mich App 226, 234-235; 627 NW2d 623 (2001).  Defendant asserts that his invocation did not need to be verbal, but provides no authority for his position.  We note that our Supreme Court has refused "to characterize as a matter of law nonutterances as being the equivalent of an affirmative exercise of Fifth Amendment rights."  *People v McReavy*, 436 Mich 197, 201-202 n 2; 462 NW2d 1 (1990).  We therefore conclude that the trial court properly determined that defendant's decision to be mute did not invoke his Fifth Amendment right to silence.

Thus, the trial court did not abuse its discretion in permitting the prosecutor to cross-examine defendant regarding his decision to remain silent.

[3] Miranda v Arizona, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

(MCOA Op. at 3-4.)

The Fifth Amendment of the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." In order to prevent coercive custodial interrogations designed to undermine the Fifth Amendment, the Supreme Court held in *Miranda v. Arizona*, 384 U.S. 436 (1966) that, when an individual is in custody, law enforcement officials must warn the suspect before his interrogation begins of his right to remain silent, that any statement may be used against him, and that he has the right to retained or appointed counsel. *Id.* at 478-79. Under *Miranda*, evidence of a defendant's custodial statement may only be introduced as evidence of guilt at trial if the defendant was first given such warnings. *Id.* at 479.

In *Doyle v. Ohio*, 426 U.S. 610, 619 (1976), the Supreme Court considered whether a defendant's silence during a custodial interrogation could be used, not as evidence of guilt, but to impeach the defendant's testimony at trial. The Court held "that the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." The theory underlying *Doyle* is that, while *Miranda* warnings contain no express assurance that silence will carry no penalty, "such assurance is implicit to any person who receives the warnings." *Id.* at 618. On this reasoning, the Court concluded that it would be fundamentally unfair first to induce a defendant to remain silent through *Miranda* warnings and then to penalize the defendant who relies on those warnings by allowing the defendant's silence to be used to impeach an exculpatory explanation offered at trial. *Id.*

However, the Supreme Court has declined to extend *Doyle* to other circumstances. *See, e.g., Salinas v. Texas*, 133 S. Ct. 2174, 2179-80 (2013) (holding that pre-arrest, pre-*Miranda* silence may be used to impeach a witness unless the witness had expressly invoked his right to silence); *Jenkins v. Anderson*, 447 U.S. 231, 236 (1980) (concluding that pre-arrest silence may be used to impeach a defendant's credibility at trial). In *Fletcher v. Weir*, 455 U.S. 603, 605-06 (1982), the Court expressly held that post-arrest, pre-*Miranda* silence can be used to impeach a criminal defendant's subsequent testimony at trial, because the government had not induced the defendant to remain silent by giving the *Miranda* warning. The *Fletcher* Court explained that *Doyle*'s prohibition on the use of post-arrest silence to impeach was based, not on the Fifth Amendment right to silence, but solely on the fact that affirmative assurances had been given in the *Miranda* warnings. *Id.*; *see also Brecht v. Abrahamson*, 508 U.S. 619, 628 (1993) (citing *Fletcher* and upholding use of a defendant's post-arrest, pre-*Miranda* silence).

According to Detective Wise, an attempt was made to give Petitioner his *Miranda* warnings, but Petitioner would not pay attention. As in *Fletcher*, if no warnings were given to Petitioner, the warnings could not have induced Petitioner's silence. At trial, on appeal and in his habeas application, Petitioner has never argued that he was given his *Miranda* warnings. Because he was not given *Miranda* warnings, *Doyle* does not apply, and Petitioner's post-arrest silence was properly used by the prosecutor to impeach the credibility of his claim that Castle's participation in the events of the evening was wholly consensual. *Fletcher*, 455 U.S. at 605-06.

The state-court's opinion, however, appears to suggest that Petitioner actually received, but waived, his right to remain silent, and that he therefore was required to reinvoke his right to remain silent in order to rely upon it. "The *Doyle* rule does not . . . apply to the prosecutor's

statements when the defendant waived his right to silence after being read the Miranda warnings."
*United States v. Lawson*, 476 F. App'x 644, 650 (citing *United States v. Crowder*, 719 F.2d 166, 172
(6th Cir.1983) (en banc) ("[T]he Doyle rule has no application unless the defendant has remained
silent and could be considered to have done so in reliance on the implied assurances of the Miranda
warnings."). In *North Carolina v. Butler*, 441 U.S. 369 (1979), the Supreme Court recognized that
an accused need not expressly waive his rights under the Fifth Amendment, as long as he voluntarily,
knowingly and intelligently does so. *Id.* at 373. In some circumstances, an accused may implicitly
waive the right to remain silent. *Id.* at 376. "[T]he question of waiver must be determined on the
'particular facts and circumstances surrounding the case, including the background, experience, and
conduct of the accused.'" *Id.* at 374-75 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). A
waiver may be inferred "from the actions and words of the person interrogated." (*Id.* at 373.)
Relying on *Butler*, the Supreme Court has held that an uncoerced statement following *Miranda*
warnings is sufficient to demonstrate a valid waiver of the right to remain silent, if the accused can
be shown to have understood his rights and if the police have not engaged in coercion. *Berghuis v.*
*Thompkins*, 560 U.S. 370, 385-86 (2010).[3] In the instant case, the court of appeals appears to have
found that Petitioner had voluntarily spoken to the police for some time and had therefore waived
his right to silence.

Arguably, Petitioner's own comments indicated that he understood his rights, as he
specifically and voluntarily told the jury that he possessed the right to remain silent and that, after
speaking for awhile, he intended to assert that right. No evidence exists that Petitioner's initial

---

[3]Although *Berghuis v. Thompkins*, 560 U.S. 370 (2010) was decided after Petitioner's conviction became final,
no contrary Supreme Court precedent barred the state-court's application of a comparable standard.

statements were coerced by police, and Petitioner makes no claim of coercion. *See id.* at 386. Nevertheless, it is not necessary to decide whether the state-court's implicit determination that Petitioner had waived his right to silence was a reasonable application of Supreme Court precedent, because any error was harmless in the circumstances.

On habeas review, a court must assess whether a trial-court error was harmless under the standard set forth in *Brecht*, 507 U.S. 619, regardless of whether the state appellate court recognized the error and reviewed it for harmlessness. *See Hargrave v. McKee*, 248 F. App'x 718, 728 (6th Cir. 2007) (citing *Fry v. Plier*, 551 U.S. 112, 120 (2007)); s*ee also Vasquez v Jones*, 496 F.3d 564, 574-75 (6th Cir. 2007). In *Brecht*, the Court expressly held that a violation of the *Doyle* rule was a trial error subject to harmless-error review. *Brecht*, 507 U.S. at 629. The *Brecht* standard requires the Court to consider whether the constitutional error in the state criminal trial had a "substantial and injurious effect" on the result. *Brecht*, 507 U.S. at 638. In determining whether the restriction was harmless, a court must consider a number of factors, "'includ[ing] the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.'" *Hargrave*, 248 F. App'x at 728 (quoting *Delaware v Van Arsdall*, 475 U.S. 673, 684 (1986)).

In the instant case, both the complaining witness and the co-defendant consistently testified to a version of events that was directly contradictory to Petitioner's own version, and Petitioner's version was uncorroborated. In addition, the record reflects that Petitioner, in a nonresponsive answer to the prosecutor's question, first introduced the fact that Petitioner had

remained silent during his interrogation. The prosecutor's subsequent questioning and commentary therefore were cumulative. Moreover, Petitioner expressly acknowledged that the victim had been beaten up by his co-defendant and admitted that he had kicked the victim multiple times, though he claimed that he was just breaking up the fight. As a result, Petitioner's argument that the victim's subsequent behavior was consensual was highly suspect. Likewise, Petitioner admitted that Castle told him that she needed her phone back, but he never gave it back to her. Further, Petitioner took the stand but did not dispute Cornelia Lewis' testimony that Petitioner asked Lewis to beat up Frederick to keep her from testifying against him. Petitioner's credibility also was severely undermined by multiple other facts, including the following: he had detailed memories of what he was wearing and other incidental facts, but no specific memories about the parties' hour-long conversation in the car, during which they all allegedly agreed to three-way sex; he hid under the bed when police arrived; he admittedly lied to his employer and deceived his parole officer; he recited an unbelievable story about how he had approached the apartment by the convoluted use of two stairways instead of directly following Frederick and the victim; his DNA was found on the grip of the handgun, despite his declaration that he knew nothing about the gun's existence; he testified that he believed that the victim was a prostitute and that she had asked for money for the sex, but he never made any attempt to negotiate and never offered her payment. In addition, the prosecutor properly challenged his credibility on the basis that, as the only testifying witness who was able to hear all of the trial testimony, Petitioner had the ability to manufacture his story. *See Portuondo v. Agard*, 529 U.S. 61, 73 (2000) (permitting comment on a defendant's presence and ability to hear the evidence of other witnesses). Finally, the state court expressly instructed the jury that, if they concluded that Petitioner intended to invoke his right to silence, they must disregard the evidence

of that silence.  The instruction significantly undercut any harm that could have arisen from the introduction of the evidence.

In sum, considering all of the evidence, the admission of the prosecutor's limited questioning and commentary about Petitioner's post-arrest silence was harmless. *See Hargrave*, 248 F. App'x at 728.  The questions and comments about his silence were cumulative, substantial evidence contradicted Petitioner's story, Petitioner's credibility was otherwise undermined, and the jury was instructed to disregard the evidence if they found he was invoking his right to silence.  For all these reasons, Petitioner is not entitled to habeas relief on his alleged *Doyle* violation.

II.     Grounds I &V:  Ineffective Assistance of Trial Counsel

In his first ground for habeas relief, Petitioner contends that he was denied the effective assistance of counsel when his attorney failed to challenge the warrantless entry and search of Petitioner's mother's  apartment and his subsequent arrest.  In Ground V, Petitioner alleges that his attorney rendered ineffective assistance, when he failed to investigate and call known witnesses and failed to be prepared for the prosecution's late-endorsed witness.

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be

considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, as the Supreme Court recently has observed, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 134 S. Ct. 10, 13 (2013); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011); *Premo v. Moore*, 131 S. Ct. 733, 740 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficult of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Richter*, 131 S. Ct. at 786).

## A. Ground I: Failure to Challenge Arrest and Search

Petitioner argues that counsel was ineffective in failing to challenge the search of his mother's apartment and his concomitant arrest on the ground that the police entered the apartment without a warrant. An independent claim that a petitioner's arrest was invalid would not provide any basis for habeas corpus relief. *See Gerstein v. Pugh*, 420 U.S. 103, 119 (1975) (illegal arrest or detention does not void a subsequent conviction). It is well settled that *Stone v. Powell*, 428 U.S.

465 (1976), bars a Fourth Amendment claim on habeas review, as long as the state has given the petitioner a full and fair opportunity to litigate the Fourth Amendment claim. *Id* (holding that an improper search may not be directly challenged on habeas review); *see also Queen v. Scroggy*, 99 F.3d 1302, 1332 (6th Cir. 1996). However, because Petitioner alleges that his attorney was ineffective in failing to challenge the warrantless arrest, he raises a cognizable claim. *See Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986) (holding that a Sixth Amendment claim based on counsel's failure to challenge a search is cognizable); *Northrop v. Trippett*, 265 F.3d 372, 378 (6th Cir. 2001).

In determining whether counsel has been ineffective in failing to challenge the warrantless search or arrest, the Court must consider whether the warrantless arrest was itself improper. *Kimmelman*, 477 U.S. at 375. "[A]bsent exigent circumstances, police officers are required to secure an arrest warrant prior to arresting a suspect in his home." *Payton v. New York*, 445 U.S. 573, 587-88 (1980) (recognizing that exigent circumstances permitting warrantless entries into a home for purposes of making an arrest are the same as those governing warrantless entries of a home for purposes of conducting a search). The *Payton* Court, however, had no occasion to "consider the sort of emergency or dangerous situation, described in our cases as 'exigent circumstances,' that would justify a warrantless entry into a home for the purposes of either arrest or search." *Id.* at 583. In *Minnesota v. Olson*, 495 U.S. 91, 100 (1990), the Supreme Court approved the description of exigent circumstances recognized by the Supreme Court of Minnesota as sufficient to justify a warrantless search or seizure:

> The court observed that 'a warrantless intrusion may be justified by hot pursuit of a fleeing felon, or imminent destruction of evidence, . . . or the need to prevent a suspect's escape or the risk of danger to the police or to other persons inside or

outside a dwelling. . . . The court also apparently thought that in the absence of hot pursuit there must be at least probable cause to believe that one or more of the other factors justifying the entry were present and that in assessing the risk of danger, the gravity of the crime and likelihood that the suspect is armed should be considered. . . . We are not inclined to disagree with this fact-specific application of the proper legal standard.

*Id.* (involving a warrantless arrest) (internal citations omitted); *see also Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011) (citing examples of exigent circumstances, including need to render emergency assistance or to protect an occupant from imminent injury, hot pursuit, and the prevention of imminent destruction of evidence).

The Michigan Court of Appeals thoroughly analyzed the question as follows:

The determination whether a defendant has been deprived of the effective assistance of counsel presents a mixed question of fact and constitutional law. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). To establish ineffective assistance of counsel, a defendant must show that counsel's deficient performance denied him the Sixth Amendment right to counsel and that, but for counsel's errors, the result of the proceedings would have been different. *People v Mack*, 265 Mich App 122, 129; 695 NW2d 342 (2005). Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise. *People v Solmonson*, 261 Mich App 657, 663; 683 NW2d 761 (2004).

It is undisputed that the police did not have consent to enter defendant's apartment and that entry was effectuated without a warrant. Generally, a warrantless search is unreasonable; however a warrant is not required when "exigent circumstances" exist. *People v Snider*, 239 Mich App 393, 407; 608 NW2d 502 (2000). Exigent circumstances permitting the police to enter a dwelling without first obtaining a warrant exist if the officers have probable cause to believe that a crime was recently committed on the premises, and probable cause to believe that the premises contains evidence or perpetrators of the suspected crime. *Id.* at 408. The police must also show the existence of an actual emergency on the basis of specific and objective facts that reveal the necessity for immediate action to (1) prevent the imminent destruction of evidence, (2) protect the officers or others, or (3) prevent the escape of a suspect. *Id.*

Defendant asserts that the police had no reason to believe that he was still in the apartment. We disagree. The police responded within hours of the reported sexual assault and the car the victim described was still in the parking lot. When the

victim left the apartment, defendant was sleeping and the police arrived in the early morning hours.

We also disagree with defendant's argument that there were no exigent circumstances to justify a warrantless entry. The record discloses that the police officers were aware that a gun had been used in the incident, and that another woman, Frederick, had been with defendant. When they knocked on the door and received no answer, they were concerned for the safety of themselves and Frederick, who still could have been in the apartment. It was this concern that led the police to enter the apartment.

The police have authority to conduct a protective search without a warrant if they reasonably believe that the area in question harbors an individual who poses a threat to them or to others. Such a search must be quick and limited, and conducted for the sole purpose of ensuring the safety of police officers and other persons.[2] *People v Cartwright*, 454 Mich 550, 557; 563 NW2d 208 (1997). We reject defendant's argument that the police could not reasonably have been concerned for their safety, because there was no evidence that the gun had been used or was even loaded. The validity of a warrantless entry of a dwelling for a protective search depends on the reasonableness of the response, as perceived by the police. *Id.* at 559. The information the police had was that a gun had been used in the incident. Regardless of whether the gun was actually loaded or even operational, it was reasonable for the police to believe that the presence of a gun posed a threat to their safety. Even though Frederick was more of a suspect than a victim at the time defendant was arrested, it also was reasonable for the police to assume that she potentially could be in danger. Frederick allowed the victim to leave while defendant was asleep and, after knocking and receiving no response, the police could not be sure if Frederick was injured or if defendant might shoot at them. Under the circumstances presented, it was not unreasonable for the police to decide that immediate action was needed to ensure their safety and the safety of others. Because the initial entry and protective sweep of the apartment was legal, and the police located defendant during this search, defendant's warrantless arrest was also legal. MCL 764.15(1)(c). Accordingly, defense counsel was not ineffective for failing to challenge the validity of defendant's arrest.

> [2] Defendant does not contend that the scope of the police officers' search was beyond that allowed for a protective search, and the evidence showed that the officers' initial search was limited to locating persons and securing the apartment.

(MCOA Op. at 2-3, docket #49.)

Although it did not directly cite federal cases, the court of appeals clearly applied the

correct federal constitutional standards respecting both ineffective assistance of counsel and the

Fourth Amendment. Moreover, the state-court's summary of the factual circumstances underlying the state's claim of exigent circumstances was patently reasonable on the facts described earlier in this report and recommendation. *See Sumner*, 449 U.S. at 546 (holding that factual findings of an appellate court are entitled to the presumption of reasonableness under 28 U.S.C. § 2254(e)(1)). The police acted promptly on the victim's report of multiple serious crimes. The victim's statement of events, her physical condition, and her ultimate identification of the apartment, together with the fact that Petitioner's car was in the parking lot, gave the officers probable cause to believe both that serious criminal activity had occurred and that the perpetrators were still present. *See King*, 131 S. Ct. at 1860-61 (declining to hold that officers must immediately seek a warrant upon minimal evidence of probable cause and that officers may instead attempt to speak with the alleged participants). Given the seriousness of the offenses, the short period between when the crimes were committed and when the home was entered, the early morning hours of both the commission of the crimes and the search, and the fact that the vehicle used in the crimes remained in the parking lot, the police had good reason to believe that the perpetrator or perpetrators were still on the premises. In addition, the police knew both that a gun had been used in the reported crimes and that a second perpetrator had acted furtively to release the victim, placing the second perpetrator herself at risk. Once officers had knocked loudly and announced their presence, officers reasonably had heightened concerns about their own danger and the danger to Frederick and other residents of the apartment complex, because they were aware that Petitioner had a gun. *Id.* at 1861 (holding that a law enforcement officer who has probable cause does not cause any exigency to be considered "police created" simply by knocking and announcing his presence in an attempt to talk or to obtain a consensual search).

In light of the totality of the circumstances, the state-court's determination that exigent circumstances justified the entry, search and arrest without a warrant was a reasonable application of established Supreme Court precedent. Given the legality of the warrantless entry, search and arrest, any motion filed by counsel would have been futile. An attorney's failure to make a frivolous or meritless motion does not constitute ineffective assistance of counsel. *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010); *O'Hara v. Brigano*, 499 F.3d 492, 506 (6th Cir. 2007); *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004).

In sum, the decision of the court of appeals was a patently reasonable application of clearly established Supreme Court precedent.

### B.    Failure to Investigate, Call Witnesses, and Object

In Ground V of his petition, Petitioner asserts that trial counsel was ineffective when he failed to investigate and call a potential witness known to him and failed to object to the prosecutor's improper comments on Petitioner's exercise of his right to remain silent. Because Petitioner failed to raise the issue on direct review, the issue appears to be procedurally defaulted, requiring Petitioner to demonstrate either cause and prejudice or manifest injustice before this Court may reach the issue. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986). However, the U.S. Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits. *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law.")). Where, as here, the procedural default issue raises more questions than the

case on the merits, the federal court may proceed to the merits without consideration of the procedural bar. *Id.*

It is well established that "[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. The duty to investigate derives from counsel's basic function, which is "'to make the adversarial testing process work in the particular case.'" *Kimmelman*, 477 U.S. at 384 (quoting *Strickland,* 466 U.S. at 690). This duty includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence. *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000); *accord Clinkscale v. Carter*, 375 F.3d 430, 443 (6th Cir. 2004). A purportedly strategic decision is not objectively reasonable "when the attorney has failed to investigate his options and make a reasonable choice between them." *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir.1991) (cited in *Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000)).

In both his state-court briefs and his brief in support of his habeas application, Petitioner makes only vague allegations. First, he contends that "counsel failed to call witness who would have credibly impeached Ms. Fredricks and the prosecutor theory that 'Ms. Fredricks was a victim.'" (Attach. to Am. Pet., docket #19-4, Page ID#252 (verbatim).) Second, he argues that "trial counsel was unprepared for these witnesses and the 'jail house snitch' as a late endorsed witness

because otherwise upon investigation these witnesses credibility could be attacked, given the long history of drugs, felonies and motivation to lie for a plea offer." (*Id.* (verbatim).)

Petitioner's allegations are wholly conclusory and fail to support his allegation that counsel failed to investigate. Indeed, a review of the record reveals that defense counsel was thorough in both his investigation and presentation of evidence.

At a hearing held November 1, 2004, on defense counsel's motion to withdraw, counsel discussed the scope of his investigation and pretrial motions. Counsel expressly informed the trial court that Petitioner had told him that he had a witness, but that Petitioner had not yet given him information about that witness. (11/1/04 Hr'g Tr. at 4, docket #35.) At a hearing on the first day of trial, February 15, 2005, defense counsel advised the court that his client had provided him with the first name and address of a man, subsequently identified as Terrence Ward, two weeks before trial. Defense counsel attempted to contact the man by telephone and called several other people in an attempt to track Ward down. He wished to speak with Ward about locating Donna Williams, who had previously lived with Ward and later lived with the victim. According to defense counsel, Williams reportedly told someone that the victim had admitted to Williams that the victim had made up the story about Petitioner's conduct. Defense counsel sought the prosecutor's assistance in locating Ward and Williams. (2/15/05 Motion Hr'g Tr. at 12-13 docket #37.) The court ordered defense counsel to provide the prosecutor with all information the defense had about the individuals and ordered the prosecutor to help locate the two witnesses. (*Id.* at 14.)

That same date, the prosecutor made an oral motion to endorse belatedly Cornelia Lewis as a witness at trial. (*Id.* at 3-4.) Defense counsel strenuously objected to Lewis's being added as a witness, arguing lack of notice and his inability to have interviewed her prior to trial. (*Id.*

at 5.) Because the facts about which Lewis would testify (Petitioner's attempt to convince Lewis to assault Fredericks) did not occur until ten days before trial, in the absence of intentional delay by the prosecutor, the court allowed the prosecutor the opportunity to endorse Lewis as a witness, on condition that defense counsel be allowed to interview Lewis before her testimony. (*Id.* at 10.)

As is apparent from this history, defense counsel actively attempted to find and call both Ward and Williams and made every effort to exclude Lewis' testimony. Moreover, defense counsel conducted a thorough cross-examination of Lewis, challenging her possible bias, the timing of her report to corrections officers, and her past conviction for larceny from a building. (Tr. VII at 104-07.) Petitioner makes no attempt to identify what else he expected counsel to do, nor does he identify any other witness that defense counsel failed to call. He therefore fails to demonstrate either that his attorney's performance was deficient or that he was prejudiced by that performance. *See Strickland*, 466 U.S. at 687-88.

In his final argument about trial counsel's performance, Petitioner contends that counsel was ineffective in failing to object to the prosecutor's comments about Petitioner's post arrest silence, made in closing arguments. To the contrary, defense counsel strenuously objected to questions or other use of Petitioner's silence to impeach his trial testimony. Counsel unquestionably met the performance prong of *Strickland* in challenging the use of Petitioner's silence. Any error in the references to Petitioner's silence was harmless. (*See* section I above.) Petitioner therefore fails to demonstrate either prong of the *Strickland* test. *Id.*

### III.    Grounds VI and VII: Prosecutorial Misconduct

In Grounds VI and VII of his habeas application, Petitioner complains of prosecutorial misconduct. In Ground VI, Petitioner argues that the prosecutor committed misconduct by

repeatedly referring to Petitioner's prior bad acts and by appealing to the jury's sympathy and civil duty in the closing arguments, including referring to Frederick as a victim. In Ground VII, Petitioner argues that the prosecutor committed misconduct when he questioned Petitioner about why, at the time he was arrested, he did not tell the police that the acts were consensual.

To be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental. *See United States v. Young*, 470 U.S. 1, 11-12 (1985). The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court. *See id.* at 12-13; *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47.

### A. Prior Bad Acts and Improper Appeal to Sympathy

In support of his argument that the prosecutor repeatedly injected Petitioner's prior bad acts and crimes, Petitioner makes only the briefest general argument:

> Petitioner argues that the jury was lead to believe that the misdemeanors and previous felonies mentioned numerous time by the prosecutor was a propensity for him to have committed the crimes in question kidnapping, rape and felon in possession of a firearm. When in actuality the prior bad acts of evidence had nothing to do with the crimes at hand, it was simply the old tactic used by the prosecutors

"pile on" and allowed by the Michigan courts who are prone to be more prosecutorial oriented.

(App. D to Am. Pet., docket #24-2, Page ID##279-80 (verbatim).)

The extraordinary remedy of habeas corpus lies only for a violation of rights secured by the federal Constitution or laws. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552 (6th Cir. 2000).

Further, under the AEDPA, the court may not grant relief solely because it would have decided the evidentiary question differently. The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000). Petitioner has not met this difficult standard.

There is no clearly established Supreme Court precedent barring use of other-bad-acts evidence as evidence of propensity. In *Estelle v. McGuire*, the Supreme Court declined to hold that the admission of prior acts evidence violated due process. *Estelle*, 502 U.S. at 75. The Court stated in a footnote that, because it need not reach the issue, it expressed no opinion as to whether a state law would violate due process if it permitted the use of prior crimes evidence to show propensity to commit a charged crime. *Id.* at 75 n.5. While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms. The Sixth Circuit has found that "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). As a consequence, no Supreme Court precedent bars the prosecutor from admitting evidence of Petitioner's prior convictions or bad acts.

Moreover, as a purely factual matter, the prosecutor made only limited references to Petitioner's prior conviction, all of which were entirely proper. First, the parties stipulated that, at the time of the offenses, Petitioner was on parole from a five-year felony conviction and that he was not qualified to possess a firearm while on parole. (Tr. VI at 85, 89-90.) That stipulation was essential to proving that Petitioner was guilty of being a felon in possession of a firearm. Second, during closing argument, the prosecutor referred to the stipulation as part of his summary of the proof supporting the charge that Petitioner was a felon in possession of a firearm. (*Id.* at 151-52.) Third, during cross-examination of Petitioner, the prosecutor drew out testimony from Petitioner that he was barred from drinking while on parole, but he still drank on the weekends, when he would not

likely be caught by his parole officer. (Tr. IX at 59-60.) Fourth, in his rebuttal, as part of his attack on Petitioner's credibility, the prosecutor mentioned Petitioner's acknowledged practice of violating his parole by drinking, but only if he thought he would not be caught. (*Id.* at 170.) Evidence and argument about Petitioner's conduct in secretly and strategically violating his parole was relevant to demonstrate that Petitioner was not credible because he was duplicitous, hiding his illegal conduct from his parole officer.

In sum, the prosecutor's use of evidence of prior bad acts was not contrary to clearly established Supreme Court precedent. In addition, the prosecutor's use of Petitioner's past and current illegal conduct was neither improper nor unfairly prejudicial.

Petitioner also complains that the prosecutor improperly appealed to the jury's sympathy and civic duty. Petitioner fails entirely to identify the prosecutor's allegedly improper comments. The Court has reviewed the prosecutor's closing and rebuttal arguments and finds no improper appeal to civic duty. Instead, the prosecutor argued only reasonable inferences from the facts.

Petitioner suggests that the prosecutor improperly referred to Cecelia Frederick, the other perpetrator as a victim, in order to invoke the jury's sympathy. The prosecutor's reference to Frederick as having become a victim at some point was an entirely reasonable argument based on the facts of the case. Frederick was 17 years old, while Petitioner was much older. Frederick testified that Petitioner had a gun and that she was afraid of him. The jury could reasonably infer that Frederick's fear of Petitioner led to some of her conduct.

The cases in which the Sixth Circuit has found prejudicial misconduct have involved much more egregious and pervasive attempts to evoke sympathy. For example, in *United States v.*

*Payne*, 2 F.3d 706, 711-15 (6th Cir. 1993), the Court of Appeals reversed a federal conviction because of the prosecutor's repeated references to Christmas time, poor pregnant women, and employee layoffs, finding that the prosecutor's statements were part of a "calculated effort to evoke strong sympathetic emotions" for victims and against the defendants. Similarly, in *Martin v. Parker*, 11 F.3d 613 (6th Cir. 1993), the Court of Appeals condemned the prosecutor's repeated references to the defendant as a "Hitler," a "dictator," a "disturbed individual," and "one of the most obnoxious witnesses you'll ever hear." *Martin*, 11 F.3d at 616; *accord United States v. Steinkoetter*, 633 F.2d 719, 720-21 (6th Cir. 1980) (prosecutor's comparison of defendant to Pontius Pilate and Judas Iscariot require reversal). The prosecutor's arguments do not compare to those condemned in these cases.

### B.        Prosecutor's Reference to Prior Silence

Section I of this Report and Recommendation concluded that the state court reasonably applied clearly established Supreme Court precedent when it allowed the prosecutor to cross-examine Petitioner on his post-arrest silence and comment on that silence in closing argument. Even if erroneous, the references were harmless. In addition, because the evidence was allowed by the trial court, the prosecutor cannot be considered to have engaged in misconduct. *See Webb v. Mitchell*, 586 F.3d 383, 397 (6th Cir. 1999) ("'A prosecutor may rely in good faith on evidentiary rulings made by the state trial judge and make arguments in reliance on those rulings.'") (quoting *Cristini v. McKee*, 526 F.3d 888, 900 (6th Cir. 2008). For all these reasons, this aspect of Petitioner's claim of prosecutorial misconduct is meritless.

IV.    Ground III:  Refusal to Allow Counsel to Withdraw

Petitioner argues that the trial court should have granted defense counsel's motion to withdraw, which was heard November 1, 2004, three months prior to trial.  Petitioner's claim was raised in his direct appeal.  The Michigan Court of Appeals carefully evaluated Petitioner's claim:

> Defendant argues that the trial court erred in denying defense counsel's motion to withdraw.  Although defendant did not file or separately move for substitute counsel, defense counsel moved to withdraw because defendant was not satisfied with his representation.  The trial court concluded that defense counsel's representation had been adequate and was not convinced that the attorney-client relationship had broken down.  This Court reviews for an abuse of discretion a trial court's decision regarding a defense counsel's motion to withdraw as counsel.  *People v Bauder*, 269 Mich App 174, 193; 712 NW2d 506 (2005).

> In *Bauder*, this Court concisely explained the appropriate legal framework.

>> An indigent defendant is guaranteed the right to counsel; however, he is not entitled to have the attorney of his choice appointed simply by requesting that the attorney originally appointed be replaced.  Appointment of a substitute counsel is warranted only upon a showing of good cause and where substitution will not unreasonably disrupt the judicial process.  Good cause exists where a legitimate difference of opinion develops between a defendant and his appointed counsel with regard to a fundamental trial tactic.  When a defendant asserts that the defendant's assigned attorney is not adequate or diligent, or is disinterested, the trial court should hear the defendant's claim and, if there is a factual dispute, take testimony and state its findings and conclusion on the record.  [*Id*. (citations omitted).]

> Defendant asserts that he established good cause. We disagree.

> Defendant's complaints were that he and his family members had not been able to contact defense counsel, that defense counsel had not sent him paperwork, and that defense counsel failed to file a motion at the preliminary examination regarding evidence found in the apartment that was to be used against him.  The evidence before the trial court did not indicate that there was "a legitimate difference of opinion" between defendant and his counsel regarding "a fundamental trial tactic."  The record discloses that defense counsel filed several pretrial motions on defendant's behalf and, on appeal, defendant does not indicate what additional motions he wanted counsel to file that were not.  To the extent that defendant believes that counsel should have filed a motion challenging the police officers' warrantless entry into his apartment, we have

already concluded that such a motion would have been futile. The trial court did not abuse its discretion in determining that good cause for defense counsel's removal had not been shown.

(MCOA Op. at 4.)

To the extent Petitioner raises his claim under state law, the question is not reviewable by this court. Questions of state law ordinarily are not cognizable on habeas review. *See Wilson v. Corcoran*, 131 S. Ct. 13, 16 (2010) ("[A] federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'") (quoting 28 U.S.C. § 2254(a)); *Estelle*, 502 U.S. at 67-68; *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).

Petitioner fails to demonstrate the existence of a federal claim. The Sixth Amendment provides a criminal defendant with the right "to have the Assistance of Counsel for his defence." An essential element of this right is a limited right to have retained counsel of one's choice. *See United States v. Gonzalez–Lopez*, 548 U.S. 140, 144 (2006). However, the right to counsel of choice is not absolute. *Id.* "Whatever the full extent of the Sixth Amendment's protection of one's right to retain counsel of his choosing, that protection does not go beyond 'the individual's right to spend his own money to obtain the advice and assistance of . . . counsel.'" *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 626 (1989) (quoting *Walters v. National Assn. of Radiation Survivors*, 473 U.S. 305, 370 (1985)). For those who cannot afford to retain their own counsel, the Supreme Court has held that the Sixth Amendment right to counsel does not guarantee "a 'meaningful relationship' between an accused and his counsel." *Morris v. Slappy*, 461 U.S. 1, 14 (1983). The Supreme Court has never recognized an indigent defendant's right to substitute counsel, as long as his appointed counsel renders constitutionally effective

assistance. *See Peterson v. Smith*, 510 F. App'x 356, 367 (6th Cir. 2013). As the state court reasonably rejected Petitioner's claim that his attorney was ineffective, Petitioner's third habeas ground does not warrant relief.

V.      <u>Ground IV: Ineffective Assistance of Appellate Counsel</u>

In his fourth ground for habeas corpus relief, Petitioner argues that appellate counsel was ineffective in failing to raise on direct appeal the claims Petitioner subsequently raised in his motion for relief from judgment (Grounds V, VI and VII).

An appellant has no constitutional right to have every non-frivolous issue raised on appeal. "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)). To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688. As the Supreme Court recently has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith v. Robbins*, 528 U.S. 259, 289 (2000). In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id.*

As set forth earlier in this report and recommendation, Grounds V, VI and VII of the petition are without merit. Where a claim lacks merit, appellate counsel is not ineffective in declining to raise the issue on direct appeal. *See Moore v. Mitchell*, 708 F.3d 760, 776 (6th Cir. 2013) ("[A] petitioner cannot show that appellate counsel was ineffective for failing to raise a claim

- 53 -

on appeal if the underlying claim itself lacks merit."); *Burton v. Renico*, 391 F.3d 764, 781-82 (6th Cir. 2004) (where claim of prosecutorial misconduct lacks merit, counsel is not ineffective in declining to raise issue on appeal). As a consequence, Petitioner's claim that appellate counsel was ineffective is meritless.

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Dated: February 5, 2014                              /s/  Joseph G. Scoville
                                                   United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).